**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DIRECTV, INC.,
*Plaintiff-Appellee/Cross-Appellant,*

v.

SCOTT WEBB,
*Defendant-Appellant/Cross-Appellee.*

Nos. 04-56847
04-56913

D.C. No.
CV-03-03399-SVW

OPINION

Appeal from the United States District Court
for the Central District of California
Stephen V. Wilson, District Judge, Presiding

Argued and Submitted
October 16, 2006—Pasadena, California

Filed September 25, 2008

Before: Procter Hug, Jr., Harry Pregerson, and
Richard R. Clifton, Circuit Judges.

Opinion by Judge Clifton

**COUNSEL**

Albert A. Zakarian (argued); Robert S. Apgood (argued), CARPELAW, PLLC; for the appellant/cross-appellee Scott Webb.

Howard Rubin (argued); Joshua G. Berman, Marc J. Zwillinger, Jacqueline Sadker, Sonnenschein Nath & Rosenthal LLP; for the appellee/cross-appellant DirecTV, Inc.

**OPINION**

CLIFTON, Circuit Judge:

Scott Webb appeals the district court's civil bench trial judgment against him for piracy of satellite television signals and modification of equipment used for unauthorized interception and decryption of satellite television signals. Based on evidence of Webb's purchase of satellite television hardware and so-called "pirate access devices" used to enable the unauthorized reception of television programming, the district court held that Webb intercepted the broadcast signal of DirecTV, Inc. ("DTV") in violation of 18 U.S.C. § 2511(1)(a) and 47 U.S.C. § 605(a). In addition, the district court held that Webb's use of a pirate access device called an "emulator" to modify legitimate DTV access cards for the purpose of unauthorized decryption constituted a violation of 47 U.S.C. § 605(e)(4).

Regarding the violation of 47 U.S.C. § 605(e)(4), our court's recent decision in *DirecTV, Inc. v. Huynh*, 503 F.3d 847 (9th Cir. 2007), resolved some of the issues raised in this case. *Huynh* held that § 605(e)(4) does not apply to personal use. Since Webb was held liable under that statute for modification of equipment which he used himself, the portion of the judgment holding him responsible for one violation of

§ 605(e)(4) must be reversed. Other violations of that statute alleged by DTV were held by the district court to be barred by the application of a one-year limitations period borrowed from California law. DTV challenges the district court's selection and application of that one-year limitations period, but we agree with the district court that the limitations period is appropriately drawn from California law, such that other potential claims against Webb for violation of § 605(e)(4) are barred as untimely.

That leaves the violations of 18 U.S.C. § 2511(1)(a) and 47 U.S.C. § 605(a), which Webb challenges with several arguments. We hold, among other things, that circumstantial evidence of signal interception can be sufficient, and was sufficient in this case, to sustain the claims, but that possession of multiple pirate devices does not in itself constitute multiple violations of these statutes.

Applying those conclusions to this judgment, we affirm in part and reverse in part, and we remand the action to the district court.

## I. Background

DTV is a provider of direct-to-home satellite broadcast programming. Unlike cable television providers, which transmit signals through fixed optical fibers or coaxial cables, DTV delivers its signals via satellite directly into its customers' homes. Customers pay for this service on a subscription or pay-per-view basis. Like conventional radio and television broadcasting, DTV's signals are broadcast through the air and can be received—or intercepted—by anyone with the proper hardware. Thus, DTV encrypts its signals to protect against signal theft.

To receive DTV's signals in unscrambled form, an individual must have a hardware system consisting of a satellite dish, a signal processor known as an "integrated receiver/decoder,"

and an "access card." The access card is a "smart card" that contains an embedded computer chip and memory, which, when authorized, allows the integrated receiver/decoder to process DTV's signals for television viewing. The access card is therefore critical to receiving usable signals from DTV. In theory, the other hardware is of little use without an authorized access card because that hardware cannot unscramble DTV's encrypted signals. In reality, so-called "pirate access devices" exist that will simulate authorization. By using such a device, a signal pirate can circumvent DTV's encryption technology and obtain unpaid access to DTV programming.

In December 1999, Scott Webb purchased a DTV television hardware system. Webb received a "pending" account at that time, which was legally incapable of decrypting DTV's transmissions because its access card was unauthorized pending account activation. Webb never activated this account and did not pay DTV for its service. Instead, he bought fifty-seven pirate access devices between August 31, 2000, and December 31, 2001.

DTV first learned of Webb in May 2001 as part of an investigation into Internet purveyors of pirate access devices.[1] The company filed suit against him on May 15, 2003, alleging numerous acts of signal piracy and pirate access device modification and distribution in violation of 47 U.S.C. § 605(a), 47 U.S.C. § 605 (e)(4), and 18 U.S.C. §§ 2511-2512.[2] Following

---

[1]Webb claims for the first time on appeal that DTV learned of his signal interception as early as January 25, 2001. That is the date Webb's girlfriend called DTV customer service to report a system malfunction linked directly to signal piracy. We do not address the merits of this claim, however, because Webb failed to raise it before the district court. *See United States v. Si*, 343 F.3d 1116, 1128 (9th Cir. 2003).

[2]Although these statutes provide criminal penalties, this is a civil suit. Both the Communications Act of 1934, 47 U.S.C. § 605 (2000), and the Wiretap Act, 18 U.S.C. §§ 2511-2521 (2003), authorize civil remedies for parties harmed by statutory violations. 18 U.S.C. § 2529(a); 47 U.S.C. § 605(3)(A).

a bench trial, the district court found that Webb was liable for committing one act of unlawful signal reception in violation of 47 U.S.C. § 605(a), fifty-seven acts of signal interception in violation of 28 U.S.C. § 2511(1)(a), and one act of access card modification in violation of 47 U.S.C. § 605(e)(4). The court awarded DTV statutory damages of $1,000 for Webb's § 605(a) violation, $10,000 for his § 605(e)(4) violation, and $123,700 for 1,237 days (at $100 per day) of signal interception in violation of § 2511(1)(a). The court also held that a one-year statute of limitations barred other § 605 claims by DTV against Webb. The court ordered equitable relief in the form of an injunction prohibiting Webb from further violations, and awarded costs and attorneys' fees in the amount of $69,681.20. Webb moved to amend the findings and the award of damages, or alternatively to receive a new trial, but the court denied this motion. Both parties appealed.

## II.   Discussion

We review the district court's conclusions of law de novo and its factual findings for clear error. *Idaho Potato Comm'n v. G & T Terminal Packaging*, *Inc.*, 425 F.3d 708, 718 (9th Cir. 2005). Under the clearly erroneous standard, the district court's findings must be upheld unless on review of all the evidence we are "left with the definite and firm conviction that a mistake has been committed." *Twentieth Century Fox Film Corp. v. Entm't Distrib.*, 429 F.3d 869, 879 (9th Cir. 2005) (internal quotations and citation omitted).

### A.   The Statutory Framework

Two federal statutes govern television signal piracy: the Federal Communications Act of 1934 ("Communications Act"), 47 U.S.C. § 605 (2000), and the Wiretap Act, 18 U.S.C. §§ 2511-2521 (2003). Neither Act originally addressed television signal piracy, but amendments made to both statutes in the 1980's extended their reach to the unauthorized reception or interception of television programming.

Concerned with "the theft of cable service," Congress in 1984 amended and supplemented the Communications Act with the Cable Communications Policy Act. *See* H.R. Rep. No. 98-934, at 83 (1984), *reprinted in* 1984 U.S.C.C.A.N. 4655, 4720. The 1984 legislation retained § 605's original prohibitions without amendment in what became § 605(a). Congress then added §§ 605(b)-(e) to curb "the growing practice of individuals taking down satellite delivered programming for private, home viewing by means of privately owned backyard earth stations."[3] 1984 U.S.C.C.A.N. at 4745. In 1988, Congress again amended the Communications Act in order "to deter piracy practices." *See* The Satellite Home Viewer Act of 1988, Pub. L. No. 100-667, § 205, 102 Stat. 3959-60. These amendments stiffened applicable civil and criminal penalties, expanded civil standing to sue, and added the provision now identified as § 605(e)(4), which prohibits the manufacture, sale, modification, and distribution of pirate access devices. H.R. Rep. No. 100-887(II) (1998), at 28, *reprinted in* 1988 U.S.C.C.A.N. 5638, 5657.

The Wiretap Act underwent a similar evolution. While the statute originally covered just "wire and oral communications," Congress passed the Electronic Communications Privacy Act ("ECPA") in 1986 to extend the Wiretap Act's protections to "electronic communications." *See Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 874 (9th Cir. 2002) (citing Pub. L. No. 99-508, 100 Stat. 1848). Unlike the Communications Act, it appears that Congress did not amend the

---

[3]In § 605(a), Congress retained "the types of unauthorized publication or use of electronic communications that ha[d] been prohibited since the Communications Act first became law." *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 911 (6th Cir. 2001). Section 605(b) provides for limited exceptions to § 605(a). Section 605(c) prohibits the encryption of "satellite delivered programs included in the National Program Service of the Public Broadcasting Service and intended for public viewing by retransmission by television broadcast stations." Section 605(d) contains definitions for the purposes of § 605, and finally, § 605(e) authorizes penalties and remedies for statutory violations.

Wiretap Act with signal piracy specifically in mind. *See United States v. Lande*, 968 F.2d 907, 913 (9th Cir. 1992) (noting that "nothing in the legislative history of the ECPA indicates particular concern about satellite pay television piracy"). Nevertheless, since the passage of the ECPA amendments courts have generally held that satellite television transmissions are "electronic communications" within the meaning of the Wiretap Act. *See id.*; *DIRECTV, Inc. v. Pepe*, 431 F.3d 162, 166 (3d Cir. 2005); *United States v. Herring*, 993 F.2d 784, 786-87 (11th Cir. 1993) (en banc); *United States v. One Macom Video Cipher II*, 985 F.2d 258, 261 (6th Cir. 1993); *United States v. Splawn*, 982 F.2d 414, 414-15 (10th Cir. 1992); *United States v. Shriver*, 989 F.2d 898, 904 (7th Cir. 1993); *United States v. Davis*, 978 F.2d 415, 417-20 (8th Cir. 1992).

### B.    47 U.S.C. § 605(a) and 18 U.S.C. § 2511(1)(a)

The first two statutory sections under which the district court found Webb liable were 47 U.S.C. § 605(a) and 18 U.S.C. § 2511(1)(a). These sections of the Communications Act and Wiretap Act both address satellite television signal piracy. Such piracy is illegal. We conclude that the district court did not clearly err in finding that Webb violated these sections.

**[1]** Section 605(a) of the Communications Act prohibits the unauthorized receipt and use of radio communications for one's "own benefit or for the benefit of another not entitled thereto." 47 U.S.C. § 605(a). That section does not specifically reference satellite communications because, as discussed previously, Congress put the prohibitions originally contained in § 605 into § 605(a) without changing the substance of the provision when it amended the Communications Act in 1984. *See Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 911 (6th Cir. 2001). When the original provision was written, DTV and the business of direct-to-home satellite broadcasting did not exist. Still, it is clear from the case law since the 1984

amendments that the "communications" protected by § 605(a) include satellite television signals. *See, e.g.*, *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 926 (9th Cir. 2006) ("By using specialized smart card programming equipment, an individual can gain unauthorized access to DIRECTV's signal, in violation of . . . 47 U.S.C. § 605."); *Nat'l Satellite Sports, Inc.*, 253 F.3d at 911-12.

**[2]** Section 2511(1)(a) of the Wiretap Act also prohibits signal piracy. That section makes it illegal to intercept "electronic communications," including satellite television signals. 18 U.S.C. § 2511(1)(a); *Lande*, 968 F.2d at 913 (acknowledging that § 2511(1)(a) prohibits "the unauthorized viewing of satellite pay television").

Webb argues that the evidence was insufficient to support the district court's finding that he pirated DTV's signals in violation of these statutes. He points first to the lack of direct evidence that he intercepted DTV's signal and second to his own testimony denying such a violation. Even under the clear error standard that applies to findings of fact, he contends, a finding that he intercepted signals cannot be sustained. We disagree.

**[3]** The law does not require direct evidence to support a factual finding. Circumstantial evidence may be sufficiently persuasive. Signal piracy is by its nature a surreptitious venture and direct evidence of actual interception may understandably be hard to come by. *See Walker v. Darby*, 911 F.2d 1573, 1578 (11th Cir. 1990) ("Direct evidence may not have been available based on the stealthiness of the invasion.") (internal quotation and citation omitted). For this reason, courts have correctly concluded that direct evidence of signal piracy is not required to prove unlawful interception. *See, e.g.*, *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 537 (5th Cir. 2005) ("Circumstantial evidence can support a finding that a communication was intercepted, even absent direct evidence."); *Walker*, 911 F.2d at 1578.

**[4]** Evidence that a person possessed a pirate access device, by itself, may not be enough to infer actual interception of a signal. *See DirecTV, Inc. v. Treworgy*, 373 F.3d 1124, 1129 (11th Cir. 2004) (finding no "private right of action against a person who possesses a device" in violation of the Wiretap Act); *Robson*, 420 F.3d at 540-42 & nn.36-37 (collecting cases). These devices may assist in the unauthorized interception of signal, but they are not capable of interception by themselves.

**[5]** In this case, however, the evidence demonstrated that Webb had more than a pirate access device. He possessed everything else he needed to intercept DTV's signals. He purchased multiple DTV receivers, but never activated any with DTV. He admittedly kept a DTV hardware system at his house. He purchased not just one or two pirate access devices, but fifty-seven of them. *Cf. Robson*, 420 F.3d at 542 (in which the court was unwilling to infer interception from the "mere purchase and possession of . . . two pirate access devices" without any evidence of the "other DTV components required for interception"). He denied unlawful interception of DTV's signal, but he failed to explain why else he would buy and possess pirate access devices and unauthorized DTV hardware for several years. The district court was not persuaded by his bare denials, and understandably so.

Moreover, there was evidence from DTV customer service records that Webb's girlfriend called DTV once from his home to complain of a system "malfunction." This "malfunction" occurred the day after DTV deployed its "Black Sunday" electronic countermeasure ("ECM"), an electronic signal broadcast by DTV to detect and incapacitate unauthorized pirate access cards. It is difficult to avoid the inference that Webb's girlfriend was accustomed to watching DTV signals on a system enabled for unauthorized reception.

**[6]** Faced with this evidence, the district court did not clearly err in finding that Webb engaged in signal piracy. *See*

*Twentieth Century Fox Film Corp.*, 429 F.3d at 879. To the contrary, the evidence was compelling. We affirm the district court's determination that Webb violated 47 U.S.C. § 605(a) and 18 U.S.C. § 2511(1)(a).

**[7]** Webb also challenges the number of violations found by the district court. In particular, the court found Webb liable for fifty-seven violations of § 2511(1)(a) based on his possession of fifty-seven pirate access devices. On that subject, we agree with Webb, though not in a way that significantly affects the outcome of the case. As we have discussed, the mere possession of pirate access devices is insufficient to create an inference of signal interception in violation of § 2511(1)(a). In order to intercept a signal, a defendant must also possess the hardware needed to capture and process satellite broadcast signals. *Robson*, 420 F.3d at 542.

**[8]** The district court found that Webb had one DTV hardware system in his possession. This system was capable of just one signal interception no matter how many devices Webb attached to it. Section 2511 offers no indication that statutory violations should be counted by the number of devices used to engage in signal interception. *Cf.* 47 U.S.C. § 605(e)(4) (providing expressly that the number of violations is established by the number of devices). Similarly, the statute itself suggests that use of a system to intercept a signal multiple times does not constitute a separate violation each time. Statutory damages for violation are authorized in 18 U.S.C. § 2520(b)(2)(B) as "the greater of $100 a day for each day of violation or $10,000," contemplating a single violation that stretched over many days. Whether Webb used one or fifty-seven devices to steal DTV's signal, his personal use of devices in conjunction with his DTV hardware constituted one violation of § 2511(1)(a). The same logic should apply to § 605(a).

**[9]** Nevertheless, the error here was harmless. The district court found Webb liable for only one violation of § 605(a)

and awarded statutory damages of $1,000. The amount of statutory damages awarded by the district court under § 2511(1)(a) would be the same if it was based on a single violation, because it was based on counting the number of days Webb was in violation, not the number of violations. Specifically, the court awarded statutory damages of $123,700 under § 2520(b)(2)(B), based on its finding that Webb engaged in signal interception for 1,237 days. We affirm those awards.

**[10]** Webb challenges the computation, arguing that even if it is assumed he engaged in piracy, the record does not support the district court's finding that he engaged in piracy for each of the 1,237 days. That time period represented the number of days between August 31, 2000, when Webb first acquired the equipment necessary for signal piracy, and the first day of his trial on January 20, 2004. The district court found that evidence that Webb possessed DTV hardware and a pirate access device as of August 31, 2000, was enough to establish unlawful interception as of that date. We agree. *See Robson*, 420 F.3d at 537; *see Treworgy*, 373 F.3d at 1127; *see Walker*, 911 F.2d at 1578.

**[11]** Webb suggests that he could not have intercepted DTV's signal after DTV deployed its Black Sunday ECM in January 2001. Webb offered no evidence, however, to prove that the ECM irreparably damaged his equipment. He never discarded or otherwise disposed of his fifty-seven pirate access devices or his DTV hardware. The district court inferred continued piracy from his continued possession of the equipment, and that inference was not clearly erroneous.

*C. 47 U.S.C. § 605(e)(4)*

Webb was charged by DTV and held liable by the district court for more than signal piracy in violation of 47 U.S.C. § 605(a) and 18 U.S.C. § 2511(1)(a). He was also found by

the district court to be liable for one violation of 47 U.S.C. § 605(e)(4), which provides that:

> Any person who manufactures, assembles, modifies, imports, exports, sells, or distributes any electronic, mechanical, or other device or equipment, knowing or having reason to know that the device or equipment is primarily of assistance in the unauthorized decryption of satellite cable programming, or direct-to-home satellite services, or is intended for any other activity prohibited by subsection (a) of this section, shall be fined not more than $500,000 for each violation, or imprisoned for not more than 5 years for each violation, or both.

Other alleged violations of § 605(e)(4) were held by the district court to be barred by the statute of limitations applicable to this section, as will be discussed in more detail below. The one violation that was sustained by the district court was based on Webb's modification of a device for his own personal use.

**[12]** In *DirecTV, Inc. v. Huynh*, 503 F.3d 847, 855 (9th Cir. 2007), our court held that 47 U.S.C. § 605(e)(4) does not apply to end-users, meaning persons who employ pirate access devices for their own personal use, rather than for sale or distribution to others. Since the one violation found by the district court was for modification of a device Webb used himself, the portion of the judgment holding him liable for that one violation of § 605(e)(4) must be reversed.

### D. Statute of Limitations

While the district court held Webb liable for violating § 605(e)(4), it concluded that he could be held liable for only one violation under that statute—"for improper modification of . . . access cards for the purpose of decrypting [DTV]'s signals"—because other claimed violations of § 605(e)(4) did

not survive the applicable statute of limitations. DTV challenges the district court's decision regarding the limitations period. We consider that argument because some or all of the other alleged violations of § 605(e)(4) arguably involved ultimate use of the devices by other persons, not by Webb himself as an end-user. DTV's claims against Webb involving ultimate use by other persons would not necessarily be barred by our interpretation of the statute in *Huynh*. We conclude that the district court was correct in its treatment of the statute of limitations, however, such that the other alleged violations by Webb are barred.

**[13]** Section 605 does not contain or reference its own statute of limitations. Accordingly, the district court borrowed a limitations period from an analogous state law: the California Piracy Act ("Piracy Act"), Cal. Penal Code §§ 593d-593e. On cross-appeal, DTV contends that the district court incorrectly applied the Piracy Act's one-year statute of limitations to its claims under § 605. DTV argues instead that the two-year limitations period of the Wiretap Act, 18 U.S.C. §§ 2510-2522, should govern its claims under § 605.

**[14]** When a federal statute does not have its own statute of limitations, we are directed to borrow a period from the forum state's analogous state law "as a matter of interstitial fashioning of remedial details under the respective substantive federal statute[ ]." *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 160 n.13 (1983); *see also Wilson v. Garcia*, 471 U.S. 261, 266 (1985) (noting that "when Congress has not established a time limitation for a federal cause of action, the settled practice has been to adopt a local time limitation"), *superceded by statute on other grounds*, Judicial Improvements Act of 1990, Pub. L. No. 101-650, 104 Stat. 5114, 369, 377-80 (2004), *as recognized in Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 377-80 (2004). State-law borrowing is a "longstanding" and "settled" practice when federal statutes do not provide for their own limitations periods. *North Star Steel Co. v. Thomas*, 515 U.S. 29, 34 (1995) (quotations

and citations omitted). This practice is rooted in the expectations of Congress and, as such, constitutes a general rule that "may not be lightly abandoned." *Lampf v. Gilbertson*, 501 U.S. 350, 356 (1991).

Though borrowing from the forum state's law is the general rule, the Supreme Court has recognized that state limitations periods do not always provide the best "vehicles for the enforcement of federal law," and that it "may be inappropriate to conclude that Congress would choose to adopt state rules at odds with the purpose or operation of federal substantive law." *DelCostello*, 462 U.S. at 161. As such, a court may instead apply a limitations period from analogous federal law when borrowing a state statute of limitations would "frustrate or interfere with the implementation" of federal law. *North Star*, 515 U.S. at 34 (citation omitted). Federal law nonetheless is limited to serving as a "secondary lender" of limitations periods to be used only as a "closely circumscribed" exception to the general preference for state law. *Id.* (quotations omitted). Courts must adopt a limitations period from analogous state law unless federal law "clearly provides a closer analogy than available state statutes, and . . . the federal policies at stake and the practicalities of litigation make that rule a significantly more appropriate vehicle for interstitial lawmaking." *Lampf*, 501 U.S. at 356 (quotations and citation omitted).

As § 605 does not have its own limitations period, the district court properly looked first to analogous state law. The district court determined that the California Piracy Act was "most closely analogous" to § 605 and that policy factors did not support adopting something else. Consequently, the district court applied the one-year statute of limitations applicable to violations of the Piracy Act to DTV's claims under § 605.

**[15]** We agree with the district court that the Piracy Act offers the proper source for a limitations period here. To start,

the California statute is remarkably similar to § 605 in purpose and structure. *See Lampf*, 501 U.S. at 358 (instructing that "commonality of purpose and similarity of elements" are relevant when choosing the proper source for a limitations period).

Congress originally enacted § 605 in 1933, but it substantially expanded the statute in 1984 in order to address "the theft of cable service." *See* H.R. Rep. No. 98-934 at 83 (1984). As we previously noted, the original prohibitions of § 605 are now contained in § 605(a), which makes it unlawful to "receiv[e], assist[ ] in receiving, transmit[ ], or assist[ ] in transmitting, any interstate or foreign communication by wire or radio" without authorization. 47 U.S.C. § 605(a). Section 605 also prohibits "divulg[ing] or publish[ing]" information gleaned from unauthorized signal reception, or otherwise using that information for one's "own benefit or for the benefit of another not entitled thereto." *Id.* The statute provides for criminal penalties and a civil cause of action in § 605(e), and, as discussed above, prohibits "the manufacture[ ], assembl[y], modifi[cation], import[ ], export[ ], s[ale], or distribut[ion]" of pirate access devices in § 605(e)(4).

**[16]** Like § 605, the Piracy Act prohibits the unauthorized reception of cable services. *See People v. Prevost*, 60 Cal. App. 4th 1382, 1396 (1998) (holding that "the clear purpose of [the Piracy Act] is to deter the theft of cable"). Section 593d of the Piracy Act prohibits the unauthorized receipt of "any program or other service carried by a multichannel video or information services provider" by means of specifically forbidden conduct.[4] Cal. Penal Code § 593d(a)(1)-(a)(4). The

---

[4]Conduct specifically prohibited by § 593d(a) includes: making or maintaining "an unauthorized connection . . . to any cable, wire, or other component of a multichannel video or information services provider's system," Cal. Penal Code § 593d(a)(1); purchasing, possessing, or attaching "any unauthorized device or devices" to such a system, *id.* § 593d(a)(2); modifying or altering "any device installed with the authorization of a multichannel video or information services provider," *id.* § 593d(a)(3); and modifying or altering "an access device that authorizes services" or obtaining a modified access device and using it "to obtain services from a multichannel video or information services provider," *id.* § 593d(a)(4).

statute also forbids a litany of conduct related to pirate access devices in § 593d(b), providing that "any person who knowingly and willfully manufactures, assembles, modifies, imports into this state, distributes, sells, offers to sell, advertises for sale, or possesses" the devices "is guilty of a public offense." And, in § 593e, the Act extends to "subscription television" providers essentially the same protections given by § 593d to providers of "multichannel video or information services."

In sum, the Piracy Act runs entirely parallel to § 605. Both the federal and state statutes recognize the property interest inherent in satellite broadcast transmissions and treat the unauthorized receipt of television signals as theft. *See* 47 U.S.C. § 605(a); Cal. Penal Code § 593d(a). Both statutes prohibit the manufacture, modification, and distribution of decryption devices. *See* 47 U.S.C. § 605(e)(4); Cal. Penal Code § 593d(b). Both prohibit unauthorized signal transmission as well as reception.[5] *See* 47 U.S.C. § 605(a); Cal. Penal Code § 593d(c). Finally, the two statutes have "similar remedial structures."[6] *Prostar v. Massachi*, 239 F.3d 669, 677 (5th

---

[5]Section 605(a) provides that no one "transmitting, or assisting in transmitting" a communication covered by the statute "shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception." Similarly, the Piracy Act prohibits the transmission or broadcasting of "any program or other service not intended to be transmitted or broadcast." Cal. Penal Code § 593d(c).

[6]Both the California and the federal statutes provide for enhanced fines and longer periods of jail time after a first offense; both provide a civil right of action to aggrieved parties; both allow civil plaintiffs to recover actual or statutory damages and injunctive relief; both enhance damages when the defendant conducted the illegal activities for commercial or private financial gain; and both allow a successful civil plaintiff to recover attorney's fees and costs. *See* 47 U.S.C. § 605(e); Cal. Penal Code §§ 593d-593e. Additionally, under both 47 U.S.C. § 605(e)(4) and Cal. Penal Code § 593e, each unauthorized device constitutes a separate violation for which damages may be imposed.

Cir. 2001) (describing this factor as relevant for the borrowing of a limitations period).

**[17]** The Piracy Act and 47 U.S.C. § 605 are so similar that the California courts have expressly characterized the Piracy Act as a state-law analogue to § 605. In *Prevost*, for example, the California Court of Appeal stated:

> [T]he clear purpose of [the Piracy Act] is to deter the theft of cable by requiring the customers who receive cable transmissions and the entities who distribute equipment to receive those transmissions to obtain authorization from the cable operator. The federal law achieves that aim in [47 U.S.C. § 553a] . . . while the state achieves it in [the Piracy Act].

60 Cal. App. 4th at 1396-97; *see also People v. Patton*, 194 Cal. Rptr. 759, 762 (Cal. App. Dep't Super. Ct. 1983) ("We find that [Piracy Act § 593e] is a state law which attempts to regulate the same subject as [47 U.S.C. § 605].").

DTV also argues that the Piracy Act cannot provide a statute of limitations for § 605 because it does not contain its own limitations period but merely incorporates the "catchall" limitations period of Cal. Civ. Proc. Code § 340. While the Supreme Court has "rejected the [borrowing] of a 'catchall' statute of limitations," this means only that a catchall limitations period is not *itself* substantively analogous. *See, e.g.*, *Agency Holding Corp. v. Malley-Duff & Assoc., Inc.*, 483 U.S. 143, 152-53 (1983) (hereinafter "*Malley-Duff*") (rejecting the borrowing of a Pennsylvania catchall period because

---

While the court in *Prostar* ultimately chose to borrow a federal limitations period, the closest state analogue to the federal act in that case was much less analogous than the Piracy Act is to § 605. *Prostar*, 239 F.3d at 669; *Cf. KingVision Pay-Per-View v. 898 Belmont, Inc.*, 366 F.3d 217, 223-24 (3d Cir. 2004) (distinguishing *Prostar* on that ground).

this period was not analogous to the federal RICO claim at issue). Unlike the catchall Pennsylvania limitations period in *Malley-Duff*, the Piracy Act is substantively parallel to § 605. The fact that the statute derives its one-year limitations period from Cal. Civ. Proc. Code § 340 is irrelevant.

Despite the clear similarities between the Piracy Act and § 605, DTV argues that the Wiretap Act offers a closer analogue to § 605 and should provide the statute of limitations for its § 605 claims. The Wiretap Act, 18 U.S.C. §§ 2510-2522, creates "a comprehensive scheme for the regulation of wiretapping and electronic surveillance." *Gelbard v. United States*, 408 U.S. 41, 46 (1972). It authorizes the electronic surveillance by law enforcement under "stringent conditions," but flatly prohibits "[u]nauthorized interceptions and the disclosure or use of information obtained through unauthorized interceptions." *Id.*

Most relevant here are §§ 2511 and 2512 of the Wiretap Act. Section 2511 prohibits the intentional interception of "electronic communications" and the use of "any electronic, mechanical, or other device" for that end, 18 U.S.C. § 2511(1)(a)-(b), as well as the disclosure or use of intercepted information. *Id.* § 2511(1)(c)-(e). Section 2512 prohibits the manufacture, distribution, possession, and advertising of pirate access devices through the mail or in interstate commerce. *Id.* § 2512(1)(a)-(c).

The Wiretap Act does plainly overlap to some degree with 47 U.S.C. § 605, as signal piracy creates causes of action under both statutes. *See Lande*, 968 F.2d at 912-13 (implying that the "two criminal statutes apply to the same conduct"). Even so, these statutes are not truly uniform in purpose or scope. Whereas § 605 and the Piracy Act both focus on signal interception as theft—the precise issue at stake here—the Wiretap Act is aimed largely at privacy protection. *Compare* 47 U.S.C. § 605(a) (prohibiting the unauthorized receipt of signal "for [one's] own benefit or for the benefit of another")

*with Konop*, 302 F.3d at 874 (holding that Congress added protection of "electronic communications" to the Wiretap Act in order "to afford [them] privacy protection"). This emphasis on privacy is evident in both the legislative history of the Wiretap Act and in the breadth of its prohibitions. *See Lande*, 968 F.2d at 913 (noting that "nothing in the legislative history of the [Wiretap Act] indicates particular concern about satellite pay television piracy"); *Doe v. Smith*, 429 F.3d 706, 708-10 (7th Cir. 2005) (holding that videotaping sex without consent and sending the footage over the Internet presents a cause of action under § 2511).

**[18]** Given the Wiretap Act's focus on privacy, we cannot say that it "clearly provides a closer analogy" to § 605 than the Piracy Act. *North Star*, 515 U.S. at 35 (quotations omitted). The Supreme Court directs that where a suitable state counterpart exists, it is "simply beside the point that even a perfectly good federal analogue [also] exists." *North Star*, 515 U.S. at 37.

Even if the California Piracy Act offers the closest analogue to § 605, DTV argues that the two-year period under the federal Wiretap Act should be applied because borrowing a limitations period from state law will, in the words of *North Star*, "stymie the policies underlying [its] federal cause of action." *See id.* at 34. Specifically, DTV contends that concerns for "uniformity" and the "geographic character" of its claims counsel for the application of a federal limitations period. *See, e.g.*, *Lampf*, 501 U.S. at 357 (identifying uniformity and geographic character as concerns relevant to the borrowing inquiry). According to DTV, the case law suggests that we must adopt a uniform federal limitations period because the geographic character of its business is such that it needs to pursue signal pirates in multiple jurisdictions across the nation.

DTV is correct that uniformity and geographic character are relevant concerns. Yet it misconstrues the meaning and

the significance of these terms. "Uniformity," for example, does not speak to a litigant's preference for a single limitations period in multiple lawsuits across multiple jurisdictions. Rather, it is a threshold question concerning how best to characterize a single federal cause of action for borrowing purposes. *Id.*; *KingVision Pay-Per-View v. 898 Belmont, Inc.*, 366 F.3d 217, 224 (3d Cir. 2004) (holding that uniformity is "used to characterize the claim for which a statute of limitations period is then to be applied"). The need for uniformity arises when the complexity of a federal action is "such that a single state limitations period may not be consistently applied within a [single] jurisdiction." *Lampf*, 501 U.S. at 357; *DelCostello*, 462 U.S. at 165-66 (holding that a hybrid § 301/fair representation claim required uniformity because the § 301 claim essentially was a contract claim while the fair representation claim had no state analogue). The need for uniformity does not dictate whether state or federal borrowing is appropriate, and it does not counsel against application of the Piracy Act's one-year statute of limitations. *See Lampf*, 501 U.S. at 357 (holding that when "a uniform limitations period is appropriate, the court must [still] decide whether this period should be derived from a state or a federal source").

DTV also misconstrues the nature and relevance of "geographic character." This term refers to whether the multistate nature of a single claim subjects that claim to the limitations periods of multiple states, creating confusion and encouraging forum shopping. *Malley-Duff*, 483 U.S. at 153-54 (noting that "conceivably the statute of limitations of several States could govern" RICO claims because the RICO predicate acts can occur in many states). Accordingly, it is irrelevant that DTV broadcasts nationally or has, as it claims to have done, filed "thousands of lawsuits in district courts across the nation." *Cf. KingVision*, 366 F.3d at 224 (finding that the multistate nature of the cable industry did not raise geographic concerns in a statute of limitations analysis under 47 U.S.C. § 553). DTV's piracy claims against the defendant in this case, Webb, do not stem from predicate acts spanning multiple jurisdictions but

from a localized violation in a single jurisdiction. We are not faced with the geographic considerations raised by cases such as *Malley-Duff*. In any event, geographic considerations do not counsel for the adoption of a federal limitations period *less* analogous than a state counterpart. *Lampf*, 501 U.S. at 357 (holding that geographic considerations may overcome the presumption for state borrowing only if the "analogous federal source *truly affords a 'closer fit' with the cause of action at issue than does any available state-law source*") (emphasis added); *North Star*, 515 U.S. at 35.

DTV's contention that one year is too short a time to investigate signal piracy claims is also unpersuasive. While the Supreme Court held in *DelCostello* that a state limitations period of between ten days and ninety days was insufficient to bring a LMRA § 301/fair representation hybrid action, 462 U.S. at 166, 167-69, we are not convinced that one year is too short a limitations period for § 605 actions. *Cf. Prostar*, 239 F.3d at 675-76, 676 n.47 (refusing to hold that "one year is too short as a matter of law for investigation and detection of [cable theft] violations" under 47 U.S.C. § 553).

Finally, DTV argues under *McAllister v. Magnolia Petroleum Co.*, 357 U.S. 221 (1958), that applying the Piracy Act's one-year limitations period to § 605 impermissibly deprives it of its rights under the Wiretap Act. *McAllister* involved an injured seaman who filed an unseaworthiness action against his employer joined with a Jones Act action for negligence. *Id.* at 222. The unseaworthiness claim had a shorter limitations period than the Jones Act claim, but the Supreme Court held that the shorter period could not be applied because it effectively barred the Jones Act claim and prevented the seaman from the full benefit of federal law. *Id.* at 225-26 ("Since the seaman must sue for both unseaworthiness and Jones Act negligence in order to make full utilization of his remedies for personal injury, and since that can be accomplished only in a single proceeding, a time limitation on the unseaworthiness

claim effects in substance a similar limitation on the right of action under the Jones Act.").

In light of *McAllister*, DTV argues that application of the Piracy Act's one-year statute of limitations deprives it of the benefit of the longer, two-year statute of limitations applicable to its Wiretap Act claims. *McAllister*, however, involved two claims so intertwined that they essentially comprised a "single cause of action." *Id.* at 229; *see also DelCostello*, 462 U.S. at 165 (in which the plaintiff had to prevail on both his LMRA § 301 claim against his employer *and* his fair representation claim against his union to prevail against either defendant). Signal piracy may give rise to liability under both 18 U.S.C. § 2511 and 47 U.S.C. § 605, but these remain separate and distinct causes of action. DTV does not need to prevail on both before it can prevail on either. *McAllister* does not govern here.

**[19]** Since we conclude that the district court properly borrowed the Piracy Act's one-year limitations period for DTV's claims under § 605, we must consider whether the district court properly applied this limitations period. Case law and the relevant statutes provide little direct guidance on when the applicable limitations period accrues for DTV's § 605 claims. The accrual of federal rights generally remains a matter of federal law even when a limitations period is borrowed from a state source. *See, e.g.*, *Wallace v. Kato*, 127 S. Ct. 1091, 1095 (2007) (holding that "the accrual date of a § 1983 cause of action is a question of federal law that is *not* resolved by reference to state law" even if state law determines the length of the limitations period) (emphasis in original); *Stanley v. Trustees of Cal. State Univ.*, 433 F.3d 1129, 1136 (9th Cir. 2006) ("Although Title IX borrows a state statute of limitations period, federal law governs the 'determination of the point at which the limitations period begins to run.' ") (citation omitted). Section 605 does not speak directly to that

issue, though, and the applicable California statute contains no accrual provision, either.[7]

[20] Under federal law, "a cause of action generally accrues when a plaintiff knows or has reason to know of the injury which is the basis of his action." *Stanley*, 433 F.3d at 1136 (internal quotations and citation omitted). The district court found that DTV "had a reasonable opportunity" to discover its § 605 causes of action against Webb in May 2001. Because DTV filed its action in May 2003, the court held that the one-year statute of limitations barred all but two of DTV's § 605 claims. According to the district court, DTV had one timely claim under § 605(a) relating to Webb's "personal use of pirate access devices to intercept DirecTV's signal," and one timely claim under § 605(e)(4) relating to Webb's use of an emulator "for improper modification of DirecTV's access cards." Other claims under § 605 were held to have been filed too late.

[21] We agree with the district court that DTV had one timely claim under § 605(a). As we have discussed, DTV had only one cognizable claim under § 605(a) in any event: the one claim resulting from Webb's own use of pirate access devices in conjunction with his DTV hardware for the unauthorized reception of DTV's signal. The district court found that Webb used his pirate access devices for the unauthorized receipt of signal from August 31, 2000, until January 20, 2004. This wrongful conduct is no different from the kind of continuing tort for which the limitations period does not start

---

[7]Cal. Civ. Proc. Code § 340(a) provides only that a one-year statute of limitations applies to "[a]n action upon a statute for a penalty or forfeiture, if the action is given to an individual, or to an individual and the state, except if the statute imposing it prescribes a different limitation." *Cf.* Cal. Civ. Proc. Code § 340(e) (providing that an "action by a good faith improver for relief under Chapter 10 . . . . begins to run from the date upon which the good faith improver discovers that the good faith improver is not the owner of the land upon which the improvements have been made").

running until the conduct ends. *See Flowers v. Carville*, 310 F.3d 1118, 1126 (9th Cir. 2002) ("When a tort involves continuing wrongful conduct, the statute of limitations doesn't begin to run until that conduct ends."). So long as Webb continued to violate § 605(a), the limitations period for DTV's claim under that section did not start. For this reason, DTV's one cognizable claim under § 605(a) was timely when filed in May 2003.[8]

**[22]** DTV's claims under § 605(e)(4) are another matter. The district court held that DTV had one timely claim under that section based on Webb's use of an emulator. Although the court found that DTV had reason to know of Webb's conduct for more than one year before filing suit, it held that one claim under § 605(e)(4) remained timely since the emulator's continuing "modification" of DTV access cards tolled the applicable limitations period. Webb challenges this tolling based on Webb's continuing personal use of the modified device, but we do not reach that issue, because under *Huynh* the personal use by Webb does not in any event constitute a violation under § 605(e)(4). Thus, we hold that DTV has no timely claims against Webb under § 605(e)(4) and reverse the portion of the judgment which found one violation of that statute.

## III.  Conclusion

Ample evidence indicates that Webb unlawfully intercepted DTV's broadcast signals in violation of 15 U.S.C. § 2511(1)(a) and 47 U.S.C. § 605(a). He can properly be held liable for only a single violation of each of those statutes, but

---

[8]Because we determine that DTV's § 605(a) claim was timely, we do not need to consider the district court's application to this claim of the continuing violations doctrine. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002) (holding that the continuing violations doctrine may toll a limitations period when the "very nature" of the injury at issue "involves repeated conduct" rather than "discrete acts").

the reduction in the number of violations of § 2511(1)(a) does not require revision of the amount calculated for statutory damages. We reverse with respect to the one violation of § 605(e)(4) found by the district court, because our interpretation of that statute in *Huynh* bars the claim.

The case is remanded to the district court for entry of an appropriate judgment. Each party is to bear its own costs on appeal.

**AFFIRMED IN PART; REVERSED IN PART; REMANDED.**